Approved: _____
MICHAEL D. MAIMIN
Assistant United States Attorney

Before: THE HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York

---

UNITED STATES OF AMERICA

-v.-

FRANK MOSS,
    a/k/a "Jigga,"

          Defendant.

**COMPLAINT**

Violation of 21 U.S.C.
§§ 841(a)(1)&(b)(1)(C) and 846; 18
U.S.C. § 2

COUNTY OF OFFENSE:
DUTCHESS COUNTY

18M 9642

---

SOUTHERN DISTRICT OF NEW YORK, ss.:

    LOUIS SCHMIDT, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration (the "DEA"), and charges as follows:

### COUNT ONE

    1.    From at least on or about August 18, 2017, up to and including August 23, 2017, in the Southern District of New York, FRANK MOSS, a/k/a "Jigga," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

    2.    It was a part and an object of the conspiracy that FRANK MOSS, a/k/a "Jigga," the defendant, would and did distribute and possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

    3.    The controlled substance that FRANK MOSS, a/k/a "Jigga," the defendant, conspired to distribute and possess with intent to distribute was mixtures and substances containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as Fentanyl, and Acetyl Fentanyl, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(b)(1)(C).

    4.    The use of such controlled substance resulted in the serious bodily injuries and deaths of Aracelis Batista and Julie Mach on or about August 21, 2017, in Poughkeepsie, New York, in violation of 21 U.S.C. § 841(b)(1)(C).

(Title 21, United States Code, Section 846).

## COUNT TWO

5.  On or about August 21, 2017, in the Southern District of New York, FRANK MOSS, a/k/a "Jigga," the defendant, intentionally and knowingly did distribute and did possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and aid and abet the same.

6.  The controlled substance involved in the offense was mixtures and substances containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as Fentanyl, and Acetyl Fentanyl, a Schedule I controlled substance.

7.  The use of such controlled substance resulted in the serious bodily injuries and deaths of Aracelis Batista and Julie Mach on or about August 21, 2017, in Poughkeepsie, New York, in violation of 21 U.S.C. § 841(b)(1)(C).

(Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); Title 18, United States Code, Section 2).

## COUNT THREE

8.  On or about August 23, 2017, in the Southern District of New York, FRANK MOSS, a/k/a "Jigga," the defendant, intentionally and knowingly did distribute and did possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and aid and abet the same.

9.  The controlled substance involved in the offense was mixtures and substances containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as Fentanyl, and Acetyl Fentanyl, a Schedule I controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); Title 18, United States Code, Section 2).

The bases for my knowledge and the foregoing charges are, in part, as follows:

10.  I am a Special Agent with the DEA, and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with other law-enforcement agents and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**The Confidential Informant**

11.　On or about August 22, 2017, law enforcement officials arrested an individual (the "CI")[1] after seeing the CI engage in what appeared to be a hand-to-hand narcotics transaction. After the arrest, the CI—who identified the CI's supplier of heroin and fentanyl as "Jigga"—agreed to make calls to and obtain drugs from Jigga. I reviewed the cellular telephone that the CI had at the time of the CI's arrest and found a phone number for "Jigga" in the phone (the 'Jigga Number").

12.　At the direction of law enforcement, the CI called the Jigga Number on the evening of August 22, 2017, and law enforcement officials recorded that call. The CI spoke with FRANK MOSS, a/k/a "Jigga," the defendant.[2] MOSS told the CI that he heard the CI had been arrested by the police. MOSS told the CI that he would call the CI back. Shortly thereafter, the CI's cell phone received an incoming call from the Jigga Number. The CI answered the phone; MOSS was on the other end. The CI told MOSS that the CI had $200 for MOSS. MOSS asked the CI about where the CI was, and about the CI's arrest. MOSS told the CI that he would not meet the CI until the next day. After the Jigga Number called the CI's cell phone several more times without success, the CI called the Jigga Number, spoke with MOSS, and arranged to meet MOSS near Brookside Avenue in Poughkeepsie.

13.　On August 23, 2017, the CI, accompanied by law enforcement agents—who had searched the CI to ensure that the CI had no drugs—approached Brookside Avenue. The CI was wearing a radio transmitter that allowed law enforcement agents to monitor the CI's conversations. The CI called the Jigga Number and arranged to meet FRANK MOSS, a/k/a "Jigga," the defendant. Law enforcement agents watched as a 2004 Nissan Altima (the "Moss Car") stopped near the CI. (Law enforcement agents had previously identified the Moss Car in the driveway of 38 Glenwood Avenue (the "Moss Building")—which was the building in which MOSS lived—and a law enforcement agents saw MOSS driving the Moss Car from the Moss Building to meet the CI). Law enforcement agents watched the CI get into the Moss Car's front passenger seat, and listened as the CI spoke with MOSS in a manner consistent with a narcotics transaction. Law enforcement agents then watched as the CI got out of the Moss Car and returned to the law enforcement agents. The CI turned 29 glassine envelopes, each containing a white powdery substance and each stamped "No Days Off," over to law enforcement agents, explaining that the CI had given MOSS prerecorded buy money, and MOSS gave the CI the glassine envelopes. At approximately the same time, law enforcement officers followed the Moss Car back to the Moss Building, where it parked.

---

[1] Since the CI's arrest, the CI has been cooperating with law enforcement officials—including as detailed herein—in an attempt to obtain the benefits of a cooperation agreement. The CI has provided law enforcement officials with information that has been corroborated independently in the past. The CI has a lengthy criminal history, including convictions for, among other things, narcotics offenses, robbery/larceny offenses, and criminal impersonation.

[2] I and other law enforcement agents listened to the recorded phone calls and/or transmitted conversations described herein, heard FRANK MOSS, a/k/a "Jigga," the defendant, speak when he was arrested, and have listened to a recorded interview with MOSS, and recognized MOSS's voice on the recorded calls and/or transmitted conversations.

A law enforcement agent conducted a field test on one of the "No Days Off" glassine envelopes; it field-tested positive for fentanyl.

14. I have proffered the CI, both during a post-arrest statement and with the CI's counsel present, and learned the following, among other things:

a. The CI initially met FRANK MOSS, a/k/a "Jigga," the defendant, in or about 2009, when the two of them were incarcerated together. At that time, MOSS told the CI that MOSS sold heroin in Poughkeepsie, and suggested that MOSS and the CI work together when they were both in Poughkeepsie.

b. The CI was released from prison on or about August 18, 2017. Upon the CI's release, the CI contacted MOSS. The CI met with MOSS that same day, and learned that MOSS had multiple runners, who sold drugs on MOSS's behalf. MOSS gave the CI a sample of heroin in a glassine bag stamped "Go Time," which the CI tried. The CI and MOSS discussed their earlier conversation about selling drugs together, and MOSS told the CI to call him the next day.

c. On or about August 19, 2017, MOSS met with the CI and provided the CI with new glassine envelopes, this time stamped with "No Days Off." The CI agreed to sell drugs on behalf of MOSS. The CI understood that MOSS or his runners would provide the CI with drugs, and, after the CI sold the drugs, the CI would pay MOSS $200 for every three bundles the CI sold; the CI typically sold the drugs for $105 per bundle. (A bundle contains ten glassine bags of heroin or fentanyl). MOSS warned the CI that No Days Off envelopes contained pure fentanyl. (The CI reported that, after the CI later tried the No Days Off drugs, the CI recognized the effects as those consistent with fentanyl).

d. In the next couple of days, the CI used some No Days Off drugs and overdosed. A friend of the CI administered Narcan,[3] and the CI recovered. The second time that MOSS supplied the CI with bundles of No Days Off, the CI told MOSS that people were "falling out"—which the CI explained is a street term for overdosing—and MOSS laughed and responded, in substance and in part, that "that's what the people want."

e. On or about August 21, 2017, the CI told MOSS that the CI needed more drugs to sell. MOSS agreed to meet the CI near Eastman Terrace, in Poughkeepsie. In the late afternoon, the CI was waiting on Eastman Terrace when he saw the Moss Car drive up to the corner of South Avenue and Eastman Terrace. The CI approached the Moss Car, and saw MOSS in the driver's seat, talking with two older white women—one of whom called herself "Jules"—who were outside of the Moss Car. The two women, the CI, and MOSS talked about purchasing heroin. Jules explained that she wanted a bundle of heroin but only had $20 on her and needed to go to an ATM machine. MOSS took three bundles of No Days Off out of the overhead sunglass storage compartment in the Moss Car, handed two glassine bags to Jules for free, and handed the other 28 bags to the CI, who sold Jules two bags. The CI called Jules's cellular telephone in order to provide the CI's phone number to Jules and agreed to give Jules more heroin if she called. MOSS drove

---

[3] From my training and experience, I know that "Narcan" is a brand name for Naloxone, which is a drug used to reverse overdoses caused by opioids such as heroin and fentanyl.

away, the CI walked away, and the two women walked—slowly, as one of them used a cane—toward a gas station where there was an ATM. Although the CI believes the CI spoke with Jules later, the CI did not ultimately sell Jules more drugs.

### The Searches

15. On or about August 23, 2017, a City of Poughkeepsie Court Judge issued a search warrant, authorizing and directing law enforcement officers to search the Moss Building, the person of FRANK MOSS, a/k/a "Jigga," the defendant, and MOSS's cellular telephone. Following is what I and other law enforcement officers did and found after receiving the search warrant.

    a. On or about August 23, 2017, in the morning, after the City of Poughkeepsie Court Judge issued the search warrant, I and other law enforcement officers saw FRANK MOSS, a/k/a "Jigga," the defendant, in the Moss Car in the driveway for the Moss Building. We arrested MOSS and searched his car. We found 14 glassine baggies, stamped "No Days Off" (the "Moss Car Baggies"), in the overhead sunglass storage compartment in the Moss Car. We also found MOSS's keys on him.

    b. After arresting MOSS, I and other law enforcement officers also searched the Moss Building. We determined which room was MOSS's because: (a) MOSS had a key that unlocked the door to the room; and (b) MOSS told us which room was his. Law enforcement officers found 198 glassine baggies, stamped "No Days Off" (the "Moss Building Baggies"), in the bottom of a golf bag in a storage closet next to MOSS's room.

16. I submitted both the Moss Car Baggies and the Moss Building Baggies to a DEA Laboratory, and reviewed the reports prepared by the DEA Laboratory. According to those reports, the DEA Laboratory tested 11 of the 14 Moss Car Baggies and 27 of the 198 Moss Building Baggies and determined that they each contained fentanyl and acetylfentanyl.

### The Deaths of Aracelis Batista and Julie Mach

17. I have spoken to a witness (the "Witness") who is related to Julie Mach. (The Witness explained that Julie Mach was known as "Jules"). The Witness told me that, on or about August 23, 2017, the Witness went into the apartment where Mach lived with Aracelis Batista (the "Batista/Mach Apartment"), on Eastman Terrace in Poughkeepsie, and found Mach and Batista, who were laying in the apartment and appeared to be dead. The Witness called 911, and emergency services soon arrived. (Emergency services confirmed that Batista and Mach were, in fact, dead when they arrived shortly after 3:00 p.m.; I have spoken with an employee of the Medical Examiner's Office who estimates that they died approximately eight-to-twelve hours before they were found).

18. I have reviewed reports and photographs regarding Aracelis Batista's and Julie Mach's death, and learned, among other things, that:

    a. The Dutchess County Medical Examiner's Office determined that the cause of death for each of Batista and Mach was acute fentanyl and acetyl fentanyl intoxication.

        b.      When the Batista/Mach Apartment and its porch was searched, two glassine baggies—torn open—stamped "No Days Off" were found in the trash, and two glassine baggies—torn open—stamped 'No Days Off" were found in the bedroom. No other glassine baggies were found during the search.[4] No other non-prescription drugs were found in the Batista/Mach Apartment.

        c.      A variety of prescription bottles, some with prescription medicine, were found in the Batista/Mach Apartment. I have reviewed the list of prescription bottles and, other than oxycodone, do not recognize any of the prescription medications as opioids.

### The Phone Records and Video Surveillance

19.    I have reviewed both phone records for the CI's phone and for the Jigga Number, and video surveillance from a gas station near Eastman Terrace and learned, among other things, the following:

        a.      The CI's phone called the Jigga Number, and the Jigga Number called the CI's phone, at least 56 times from August 18, 2017, through August 22, 2017.[5] The first such contacts were an 11-second call from the CI's phone to the Jigga Number at or about 8:56 a.m. on August 18, 2017, and a 200-second call from the CI's phone to the Jigga Number at or about 9:49 a.m. on August 18, 2017.

        b.      The CI's phone first dialed the cell phone number used by Julie Mach[6] (the "Mach Number") on or about August 21, 2017, at or about 6:41 p.m. At or about 7:09 p.m. the Mach Number called the CI's phone.[7] Shortly after 7:00 p.m.,[8] two women who appear to be Aracelis Batista and Julie Mach entered a gas station approximately 0.2 miles from Eastman

---

[4] A relative of Julie Mach's reported to law enforcement officials that he/she entered the Batista/Mach Apartment after law enforcement officials left and found an additional glassine bag, which he/she provided to law enforcement officials. I have looked at the glassine bag that the relative provided to law enforcement officials; it appears to have a white powdery substance in it, but is still sealed, which indicates that it was not used.

[5] The CI explained that the CI would also call a phone number, listed in the CI's phone as "Jiggaaaa" (the "Jiggaaaa Number"), that was affiliated with FRANK MOSS, a/k/a "Jigga," the defendant, and his runners. Phone records also show frequent contact between the CI's phone and the Jiggaaaa Number from August 18, 2017, through August 22, 2017.

[6] The Witness confirmed that the Mach Number was Julie Mach's cellular phone number.

[7] I have reviewed video surveillance of a store a little over six miles from Eastman Terrace. It shows a car with the CI in it enter the parking lot at approximately 7:08 p.m. According to that video surveillance, the CI left the store's parking lot at approximately 8:11 p.m.

[8] There are two surveillance videos from the gas station; the time stamps appear to be misaligned from one another by a little over 10 minutes.

Terrace, Mach withdrew money from an ATM in the gas station, and Batista and Mach left the gas station.

    c. At approximately 7:14 p.m., the CI's phone called the Jigga Number; the Jigga Number called the CI's phone at approximately 7:18 p.m., at approximately 8:33 p.m., and approximately 8:57 p.m. The CI's phone called the Jigga Number at approximately 9:19 p.m, the Jigga Number called the CI's phone at approximately 9:28 p.m. At approximately 9:48 p.m., the CI's phone called the Mach Number. At approximately 10:26 p.m., the CI's phone called the Jigga Number.

### The Post-Arrest Statement

20. Following the arrest of FRANK MOSS, a/k/a "Jigga," the defendant, law enforcement agents interviewed MOSS. The interview was video-taped. I was present for part of the interview, and have reviewed the video-tape. After waiving his *Miranda* rights and agreeing to speak with us, among other things, MOSS admitted to being involved in heroin for "a couple weeks," and stated he did not sell heroin on the street, but rather that "I had a guy … that deals with people in the street," which "guy" MOSS identified as the CI. MOSS also admitted that he had access to the storage closet in which law enforcement agents found the Moss Building Baggies, and kept a port-a-potty in that closet.

  WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of FRANK MOSS, a/k/a "Jigga," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

              _____
              SPECIAL AGENT LOUIS SCHMIDT
              DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
13th day of November, 2018

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK